McKEAGUE, Circuit Judge,
dissenting.
The Majority finds that there remains a factual determination as to whether the fentanyl patch is a “combination product” under the Food, Drug, and Cosmetic Act. I disagree with the Majority’s interpretation of the Michigan immunity statute and would instead hold that Mylan’s Fentanyl Transdermal System is a “drug” under 21 U.S.C. § 321(g)(1) and therefore Mylan is immune from suit under Michigan law. I respectfully dissent.
Determining whether the Mylan Fenta-nyl Transdermal System should be considered a “drug,” a “device,” or “combination product” requires first looking at the definition of “combination products.” [1] As the Majority correctly notes, one must look to the FDA regulations, 21 C.F.R. § 3.2(e)(1),[2] to find a definition. Under the regulations, a combination product is simply “two or more regulated components,” comprising either a “drug” and “device” or a “drug” and “biologic,” etc. Id. There is no claim that the transdermal patch includes a “biologic.” Following our invitation, Plaintiff now argues that the *681 transdermal patch comprises a drug (fen-tanyl) and a device (the patch), and that the device malfunctioned. PL’s Br. at 12-13. The Michigan immunity statute does not define “device” but simply provides that “drug does not include a medical appliance or device.” Mich. Comp. Laws § 600.2945(b). As the Michigan immunity statute relies on the federal Act for its definition of “drug” and the regulation defining “combination product” relies on the federal Act for defining “drug”[3] and “device” [4] I turn to those definitions to see if Mylan’s Fentanyl Transdermal System is a “combination product.”
Mylan’s Fentanyl Transdermal System’s “components” are described in the official labeling of the product, which is approved by the FDA. See R. 12, Dist. Court Op. at 4, PagelD #283; R. 5-3, Mylan’s Labeling at 2, Page ID # 125. The components are described as follows:
System Components and Structure. The amount of fentanyl released from each system per hour is proportional to the surface area (25mcg/hr per 6.25 cm). The composition per unit area of all system sizes is identical.
Fentanyl transdermal system is a translucent rectangular patch with rounded corners comprising a protective liner and two functional layers. Proceeding form the outer surface toward the surface adhering to the skin, these layers are: 1) a backing layer of polyester film; and 2) fentanyl containing silicone adhesive layer. Before use, a protective liner that is attached to and covering the adhesive layer is removed and discarded.
Fentanyl transdermal systems are packaged with additional pieces of protective film above the system within each pouch. These are also discarded at the time of use.
The active component of the system is fentanyl. The remaining components are pharmacologically inactive.

Id.

After considering the definition of “device” and “drug,” I conclude that the patch does not include a “device.” While the fentanyl patch could possibly be considered an “instrument” or “apparatus,” because the patch achieves its “primary intended purposes” of relieving pain through some “chemical action within or on the *682 body” and fentanyl must be metabolized in order for it to be effective, the patch does not fit the definition of “device.” 21 U.S.C. § 321(h)(3). A “device”- -may not achieve its “primary intended purpose” through “chemical action” or metabolization. Id. As indicated in the labeling of the Mylan Fentanyl Transdermal System, the fentanyl patch achieves its “primary intended purpose” through both means, and therefore does not meet the definition of “device.” R. 5-3, Mylan’s Labeling at 2, Page ID # 125. Furthermore it is noteworthy that the labeling for the Mylan Fentanyl Transdermal System, approved by the FDA, includes absolutely no suggestion that the system includes a device or is a combination product.[5] There is nothing to suggest that the FDA, when approving the label thought any part of Mylan’s Fentanyl Transdermal System was a device. Furthermore, Mylan’s Fen-tanyl Transdermal System does accurately fit the FDA’s definition of “drug.” As defendants articulate in their brief, the FDA’s definition of “drug” includes “articles intended for use as a component of any article,” where an “article” may be any of the three earlier described categories for “drugs.” The Mylan Fentanyl Transdermal System could be considered either an article “intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man” or an article “intended to affect the structure or any function of the body of man,” as the fenta-nyl patch is designed to alleviate longterm pain. Furthermore, the FDA describes the adhesive matrix and the pharmacologi-cally inactive ingredients as “components” of the product in the labeling. R. 5-3, Mylan’s Labeling at 2, Page ID # 125. Accordingly, -because the Mylan Fentanyl Transdermal System is a “drug,” and the system does not include a “device,” it is not a “combination product” under the FDA’s definition.
My interpretation of the term “combination product” and conclusion that the My-lan Fentanyl Transdermal System is a “drug” and not a combination product is further supported by the FDA’s statutory scheme and limited caselaw.
The statutory scheme of “combination products” and evidence before the district court, in particular, support my conclusion that the Mylan Fentanyl Transdermal System consists of only a “drug.” The FDA promulgated the final rule defining “combination products” on November 21, 1991. “Assignment of Agency Component for Review of Premarket Applications,” 56 FR 58754-01, Nov. 21, 1991; see 21 C.F.R. § 3.2(e). The rule sets forth the process by which the FDA designates the agency that has primary jurisdiction over a combination product. 21 C.F.R. § 3.7.[6] In order *683 for “combination products” to obtain FDA approval two steps must be met. First, the applicant files a “request for designation” with the FDA. Id. Second, the FDA issues a “letter of designation,” informing the applicant which FDA division has primary jurisdiction over the product. See 21 C.F.R. § 3.2(i) (“Letter of. designation means the written notice issued by the product jurisdiction officer specifying the agency component with primary jurisdiction for a combination product.”). The “letter of designation” constitutes an “agency determination,” and the division which has primary jurisdiction is only subject to change by the product jurisdiction officer, as specified by the procedures in the regulations. See 21 C.F.R. § 3.9.
In designating the division that will have primary jurisdiction over the product, the FDA determines the “primary mode of action” of the product. 21 C.F.R. § 3.4. The “primary mode of action” determination involves the technical application of the definition provided in 21 C.F.R. § 3.2(k) to ascertain the means by which a product achieves an intended therapeutic effect. For example, where the primary mode of action is determined to be through a “drug,” then the division of the FDA that is in charge of regulating drugs has primary jurisdiction over the product.
In this case, after reviewing the record before the district court, it appears that the defendants did not file a “request for designation,” nor did they receive a “letter of designation” from the FDA. This is important, as the FDA is the agency primarily responsible for categorizing “combination products.” 21 U.S.C. § 353(g); see also Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 627, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973) (holding that the FDA has primary jurisdiction to determine that a product is a ‘new drug,’ subject to review in the court of appeals).
Moreover, the one letter from the FDA in the record, a letter from the FDA approving the fentanyl patch, only uses the word “drug.” See R. 5-2, Approval Letter to Mylan at 2-4, Page ID # 121-23. There is no mention of the terms “combination product” or “device.” Id. The division responsible for sending the letter of approval was the “Office of Generic Drugs, Center for Drug Evaluation and Research.” Id. at 4, PagelD # 123. Accordingly, even if the defendants had requested a “letter of designation” to determine which unit of the FDA had primary jurisdiction, the fact that the Office of Generic Drugs approved Mylan’s Fentanyl Trans-dermal System suggests that the FDA determined that the primary mode of action of fentanyl was that of a “drug.” The FDA was acutely aware of the various designations under which the fentanyl patch could be classified.[7] There was no *684 indication before the district court, or before this Court, that fentanyl was designated as any product other than a “drug.”[8]
The Majority’s approach leads to courts second-guessing the FDA’s designation of a given product. As in this case, the only evidence in the record shows that the FDA designated the fentanyl patch as a “drug.” In my view, the inquiry stops there. While the letter may is not a “formal” agency action, intended to have the force of law, the FDA’s designation of a product as a “drug,” “device,” or “combination product,” is entitled to deference as it comes from the agency charged with making such nuanced designations. See Air Brake Sys., Inc. v. Mineta, 357 F.3d 632, 643 (6th Cir.2004). The Majority’s approach appears to give little or no deference to the FDA’s designation, instead opting for courts to make an independent evaluation of whether a product is a “drug,” “device,” or “combination product.” As the FDA is the agency with the authority to make such designations and has far greater expertise in this area than courts, I would continue to give deference to the FDA’s determinations and not grant courts the purview to begin making their own designations, particularly where the complaint does not even allege that the product is anything other than a drug.
The Majority’s biggest criticism of the district court’s determination that the fen-tanyl patch is a “drug,” for purposes of the Michigan immunity statute, is that it failed to take “full account of the statutory scheme governing federal drug regulation.” Maj. Op. at 677. The Majority argues that the district court did not consider the 1990 amendment to the federal act adding combination products as a third category of products to the FDA’s regulatory scheme. Because Michigan’s immunity statute was passed in 1995 and the changes to the FDA’s statutory scheme occurred prior to the Michigan legislature’s enactment of the Michigan immunity statute, the Majority finds the omission of the term “combination product” in Michigan’s immunity statute to be significant. As courts often employ the canon that inclusion of one definition implies the exclusion of the other, Nationwide Mut. Ins. Co. v. Cisneros, 52 F.3d 1351, 1357 (6th Cir.1995), the Majority seems to say that this Court should presume that the Michigan legislature knew that there was a distinction between “drugs” and “combination products” and therefore, chose to not provide immunity for “combination products.” Because I conclude that Mylan’s Fentanyl Transdermal System is not a “combination product,” I would not reach the question of *685 whether the district court erred in not taking full account of the “statutory scheme” governing federal drug regulation.
The Majority also takes issue with the district court’s refusal to distinguish the pharmacologically active and inactive components of the fentanyl patch in considering whether the fentanyl patch is a “drug” or includes a “device.” Maj. Op. at 676-77. The Majority states that it is not convinced that the phrase “article intended for use as a component” applies to a product that “appears to have a mechanical (rather than chemical) effect on the human body,” like the patch. Maj. Op. at 677. First, there is no support for that conclusion whatsoever in the record. Moreover, the limited case-law addressing products with features similar to the fentanyl patch have not drawn such distinctions. In Lake-Allen v. Johnson & Johnson, L.P., No. 08-cv-930, 2009 WL 2252198 (D.Utah Jul. 27, 2009), a Utah district court specifically addressed the fentanyl patch. The case involved a products liability action against the manufacturer of Duragesic,[9] “an FDA-approved prescription transdermal pain medication containing fentanyl.” Id. at *1. Plaintiff claimed that the decedent’s death was “due to a deadly dose of fentanyl introduced into his body via the reservoir system of a Duragesic patch.” Id. Defendant moved to dismiss all causes of action that were based on design defect liability, based on Utah’s strict liability design defect jurisprudence. Plaintiff argued that the Dura-gesic patch is more akin to a “drug container and is therefore not exempt from any design defect claims.” Id. at *2. The district court rejected plaintiff’s argument, stating:
Plaintiffs’ argument that the patch is more akin to a container is unpersuasive. The Duragesic patch was approved by the FDA as a drug and to categorize it as a container is akin to categorizing any substance available in a time release capsule as a container. In the case of prescription pharmaceutical patches, it is nonsensical to separate the liability of the overall product and the substance that it releases.
Id. at *3; see also R.12, District Court Op. at 14, PagelD #293 (quoting same language); Bower v. Johnson & Johnson, 795 F.Supp.2d 672 (N.D.Ohio 2011).[10]
Accordingly, based on the statutory scheme for “combination products” and caselaw addressing fentanyl transdermal systems and similar products, I do not agree with the Majority’s conclusion that Mylan’s Fentanyl Transdermal System is a “combination product.” Instead, I would hold that Mylan’s Fentanyl Transdermal System is a “drug” and that immunity attaches in this ease, and I would not reach the question of whether immunity attaches to “combination products” under Michigan’s immunity statute.
I respectfully dissent.

. As a preliminary matter, the parties never mention the term "combination product” in their initial briefs before this Court. Furthermore, the parties did not argue that Mylan's Fentanyl Transdermal System was a "combination product” before the district court. Plaintiff does not allege that the product was a "combination product" in the Complaint. R. 1-7, Complaint, et seq. The term "combination product” was sua sponte raised by this Court, when it asked the parties to address whether Mylan’s Fentanyl Transdermal System is a "combination product” and whether the manufacturer of a "combination product” is immune from suit under Michigan law. The Plaintiff had an opportunity to amend her complaint when Defendants filed their motion to dismiss based on Michigan’s immunity statute, to allege that Mylan’s Fentanyl Transder-mal System was a "combination product” and therefore was not immune from suit; Plaintiff took no such course of action. Accordingly, I would not even address the question of whether this product is a "combination product” because Plaintiff has waived raising this argument in the district court. See Scottsdale Ins. Co. v. Flowers, 513 F.3d 546, 551 (6th Cir.2008). And, while this Court can consider novel questions for the first instance on appeal in exceptional circumstances where a miscarriage of justice would otherwise occur, the "novel issue,” of whether the fentanyl patch is a "combination product,” was not even raised by the parties. Friendly Farms v. Reliance Ins. Co., 79 F.3d 541, 545 (6th Cir.1996) (providing the standard for when the court of appeals may entertain issues not raised in the district court). Accordingly, I do not think this Court should even be addressing the legal issue of whether this product is a "combination product,” as the issue was waived by the Plaintiff in the district court and this case does not present exceptional circumstances where a miscarriage of justice would otherwise occur.

. C.F.R. § 3.2(e)(1) provides the definition of "combination product:”
(1) A product comprised of two or more regulated components, i.e., drug/device, biologic/device, drug/biologic, or drug/device/biologic, that are physically, chemically, or otherwise combined and produced as a single entity;....

. U.S.C. § 321(g)(1) provides the definition of “drug,” as:
(A) articles recognized in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (D) articles intended for use as a component of any article specified in clause (A), (B), or (C).

. U.S.C. § 321(h) provides the definition of "device,” as:
an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is—
(1) recognized in the official National For-mulary, or the United States Pharmacopeia, or any supplement to them,
(2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or
(3) intended to affect the structure or any function of the body of man or other animals, and which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes.

. The FDA’s premarket approval of a new drug application includes the approval of the exact text in the proposed label. 21 U.S.C. § 355. In general, a manufacturer may only change a drug label already approved by the FDA by filing a “supplemental application” with the FDA. Wyeth v. Levine, 555 U.S. 555, 568, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009); Strayhorn v. Wyeth Pharms., Inc., 887 F.Supp.2d 799, 809 (W.D.Tenn.2012) (noting that in order for a drug manufacturer to change the label, the manufacturer must go through a formal process through the FDA). Regulations provide that the FDA must approve the labeling in order for a new drug to be "approved.” 21 C.F.R. § 314.105 (2008). Therefore, the language included in the label is approved by the FDA. This Court should not begin second-guessing labels approved by the FDA, which has primary jurisdiction over labeling such products.

. The regulation provides, in part, that an applicant requesting that his product be designated,- as either a “drug,” “device,” or “combination product”:
(a) Who should file: the sponsor of:
(1) Any combination product the sponsor believes is not covered by an intercenter agreement; or
*683 (2) Any product where the agency component with primary jurisdiction is unclear or in dispute.
(b) When to file: a sponsor should file a request for designation before filing any application for premarket review, whether an application for marketing approval or a required investigational notice. Sponsors are encouraged to file a request for designation as soon as there is sufficient information for the agency to make a determination.
21 C.F.R. § 3.7.

. If the Office of Combination Products determined that the product was a “combination product,” the "letter of designation” could specify any of the following divisions having primary jurisdiction over the product: “Center for Drug Evaluation and Research”; "Center for Devices and Radiological Health”; or the “Center for Biologies Evaluation and Research.” The "Office of Generic Drugs” is a subpart of the “Center for Drug Evaluation and Research.” Combination Products, "Capsular Descriptions of Jurisdictional Determinations,” http://www.fda.gov/ CombinalionProducts/Jurisdictional *684 Information/RFDJurisdictionalDecisions/ CapsularDescriptions“One-Liners "/default htm (last visited Jan. 14, 2014). It is not clear whether any of the divisions exercising jurisdiction over the "combination product" would refer to the product as a “combination product” or would rather simply refer to the product by its primary mode of action. Accordingly, the only clear indication of whether the FDA considers a product to be a "combination product” is its designation in the "letter of designation.”

. It is also worth noting that the district court recognized the significance of the FDA's Office of Generic Drugs approving Mylan’s Fen-tanyl Transdermal System:
[I]t appears beyond, dispute that the FDA deemed and approved the MFTS (the system — not some discrete part of the system) as a drug. As noted above, on January 29, 2005, the FDA issued its approval of My-lan’s Abbreviated New Drug Application for "Fentanyl Transdermal Systems,” concluding that “the drug is safe and effective for use as recommended in the submitted labeling.” ... There is no question that in considering Mylan’s ANDA [Abbreviated New Drug Application], the FDA deemed the MFTS, the patch, to be a drug; not a device and not something less than its whole.
See R. 12, District Court Op. at 11, PagelD #290.

. Mylan’s Fentanyl Transdermal System is the generic version of Duragesic.

. In Bower v. Johnson & Johnson, 795 F.Supp.2d 672 (N.D.Ohio 2011), the district court reviewed a motion for summary judgment in litigation involving the Ortho Evra birth control patch. The suit involved a products liability claim. It is unclear from the opinion what specific type of defects the plaintiff was alleging with the patch. The district court held, after considering plaintiff's claims in the context of the Michigan immunity statute "and there being no dispute that Ortho Evra was subject to and successfully completed the FDA approval process,” that plaintiff’s products liability claims were precluded as a matter of Michigan law. Id. at 677. Accordingly, the court in Bower held that the fact that the "drug” was approved by the FDA, immunity attached.