CHEMETRON CORPORATION, a corporation, et al., Petitioners,

v.

The UNITED STATES DEPARTMENT OF HEALTH, EDUCATION AND WELFARE et al., Respondents.

CHEMETRON CORPORATION, a corporation et al., Petitioners,

v.

The UNITED STATES DEPARTMENT OF HEALTH, EDUCATION AND WELFARE et al., Respondents.

Nos. 72–1864, 72–2217.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 7, 1973.

Decided Jan. 24, 1974.

---

62. (38 Fed.Reg. 29,510 (October 25, 1973)).

Eugene I. Lambert, Washington, D. C., with whom Walter E. Byerley, Washington, D. C., was on the brief, for petitioners. Wayne K. Hill, Washington, D. C., also entered an appearance for petitioners Chemetron Corp. and Dawes Laboratories.

Howard S. Epstein, Atty. Dept. of Justice, with whom Peter Barton Hutt, Asst. Gen. Counsel, Health, Education and Welfare, Joanne S. Sisk, Chief, Appellate and Special Proceedings Branch, and Robert M. Spiller, Jr., Atty. Food, Drug and Product Safety Division, Health, Education and Welfare, were on the brief for respondents.

Before McGOWAN, TAMM and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge.

This case is one of two cases decided today involving the Food and Drug Administration's (FDA) withdrawal of approval of New Animal Drug Applications (NADA's) for diethylstilbestrol (DES). The instant case challenges FDA's disapproval of NADA's for DES feed premixes; the other case, Hess and Clark v. FDA, No. 73–1581 (consolidated with Vineland Laboratories v. FDA No. 73–1589), 161 U.S.App.D.C. ——, 495 F. 2d 975, involves implant pellets, the alternate dosage form of DES. Although these cases are not precisely the same, they contain several identical issues. Our disposition of the present case is governed by our extensive discussion in *Hess and Clark*. This opinion will be more brief—summarizing the background of the instant case, and the reasons for our disposition.

## I. BACKGROUND

DES is a synthetic estrogen used to promote animal growth. The petitioners in the instant case manufacture DES in both liquid and dry form for mixture into feed for cattle and sheep. Typically, cattle are given the feed containing DES in a feed-lot for several weeks immediately prior to slaughter. It enables them to grow faster while using less feed, and while generating less solid waste. When used in this fashion, DES yields significant economic benefits for beef consumers.

Counter-balancing these benefits is a known risk: DES is a carcinogen. As such it ordinarily would be kept from the market by the Delaney Clause, § 512(d)(1)(H) of the Act, codified at 21 U.S.C. § 360b(d)(1)(H), which flatly prohibits sale of drugs that are proven carcinogens—subject however, to the exception contained in a clause sometimes labeled the "DES clause." The "DES clause" allows the sale of carcinogenic animal drugs

> . . . if the Secretary finds that, under the conditions of use specified in proposed labeling and reasonably certain to be followed in practice (i) such drug will not adversely affect the animals for which it is intended, and (ii) no residue of such drug will be found (by methods of examination prescribed or approved by the Secretary by regulations . . . ), in any edible portion of such animals after slaughter or in any food yielded by or derived from the living animals;
>
> . . .

This exception to the Delaney Clause recognizes the fact that DES passes out of an animal's system within a relatively short period. For that reason, if administration of DES ceases a sufficient time prior to slaughter, the slaughtered carcass will contain no DES residues.

Adhering to the provisions of the clause, the FDA allowed DES to be sold until 1973 because it never detected any disqualifying residues while using the "approved test method," the mouse-uter-ine test. In 1971, however, the U.S. Department of Agriculture began to test carcasses using a different method, a method that was not then and is not now an "approved test method." This testing revealed residues which USDA attributed to DES usage. Apparently, however, the USDA and FDA felt that these detected residues resulted from improper administration of DES for the FDA's response was to extend the required time period between cessation of DES administration to animals and slaughter of those animals.

Nonetheless, the USDA continued to detect residues after this change in the regulations. Accordingly, on June 21, 1972, the Commissioner issued a notice of intent to withdraw his approval of all NADA's for DES, and offered all interested NADA holders an opportunity for a hearing (37 Fed.Reg. 12,251). In the Notice, the Commissioner indicated his particular concern with the possibility of misuse of DES feed premixes, which are anonymous when added to feed. As noted in the *Hess* opinion, this Notice explicitly contemplated that it was a precursor to hearings to be held to investigate the nature of the DES problem.

Petitioners timely responded to the June, 1972, Notice, and requested hearings. The FDA, however, on August 4, 1972, refused the requests for hearing, and simultaneously withdrew its approval of the NADA's for feed premixes. (37 Fed.Reg. 15,747) In taking this action, the FDA relied upon test results received just prior to promulgation of the Order:

> [u]ntil Friday, July 28, 1972, the Commissioner was unaware of the existence of any data indicating that use of [DES premixes] under the conditions contained in the approved label would result in detectable residues of DES in the edible portion of animals.
>
> .    .    .    .    .    .

On Friday, July 28, 1972, the Commissioner was informed of the results of a research study undertaken by the

U.S. Department of Agriculture in which it was found, using radioactive-tagged DES in six steers, that detected residues occurred in the liver from a single 10mg. oral dose of DES after withdrawal for 3, 5, and even 7 days. (37 Fed.Reg. 15,748–49)

In turn, the Commissioner stated that these tests results, uncontroverted by any submitted alternative data, did not admit "the existence of a genuine and substantial issue of fact" so that no hearing need be held. Moreover, the Commissioner found that the test results compelled him to withdraw his approval of petitioners' NADA's:

> This action is required under the strict terms of sections 512(d)(1)(H) and 512(e)(1)(B) of the act. These provisions, which contain the Delaney Clause, require that there be no detectable residue. The new USDA study clearly shows residues that are in the range of current detection methodology; new detection methodology is being developed that would be significantly more sensitive. Thus, under the law there is no alternative but to withdraw approval of the drug, even though there is no known public health hazard resulting from its use. (37 Fed.Reg. 15,749)

Although ordering an end to manufacture of premixes, the FDA allowed continued marketing of existing inventories until January 1, 1973. *Id.* Thereafter, on December 9, 1972, the FDA withdrew the regulations governing use of DES feed premixes, as required by statute. (37 Fed.Reg. 26,307) Petitioners appealed these Orders and their appeals are the subject of the instant case.

## II. INADEQUACY OF THE JUNE, 1972, NOTICE AS A BASIS FOR SUMMARY DISPOSITION WITHOUT OPPORTUNITY FOR HEARING

As in *Hess*, the petitioners argue that the challenged FDA order is legally defective because the FDA promulgated it without giving them a hearing. There are two means by which the approval of an existing NADA can be withdrawn without holding a hearing. (*See Hess*, at ——–——, at 982–983 of 495 F.2d) First, the Secretary can suspend the approval on the basis of a finding that continued approval would present an imminent hazard to public health. Second, the summary judgment procedure may be invoked. In the instant case, the Commissioner expressly denied the presence of any public health hazard in the order of withdrawal. Instead, he relied on the summary judgment power. The issue is whether he properly invoked and executed the summary judgment procedure.

■ The first question is whether the FDA provided petitioners "due notice and opportunity for hearing" within the meaning of the statute, 21 U.S.C. § 360b(e)(1). The Commissioner argues that the only notice given to petitioners, in June 1972, meets the statutory requirement. In *Hess* we have noted several difficulties with the Commissioner's position. The principal difficulty is that the June 1972, Notice, "did not and could not contain any of the data on which the FDA relied in withdrawing its approval of the petitioner's NADA's". (*Hess*, at p. ——, at p. 986 of 495 F.2d) Other difficulties noted included these: "(1) That it [the June, 1972, Notice] took no particular account of the difference between normal label-specified dosage of DES, whether by premix or by implant, and excessive or abusive dosages; (2) that it failed to specify the nature of the residues detected, but implied only that they consisted of DES; and (3) that it referred to no specific testing program, but only to the use of new test methods in normal surveillance of commercially slaughtered animals." We added that the Notice "does not communicate that the FDA was contemplating withdrawal, and certainly does not indicate that FDA was contemplating withdrawal without a hearing." (*Id.* at ——, at 986 of 495 F.2d)

For these reasons, the June, 1972, Notice falls far short of the standard announced in *Hess* for notice adequate to permit summary withdrawal of petition-

ers' products. It failed to present a *prima facie* case against petitioners' products. Indeed, it had to fail, for the Commissioner had no data on which to base his ultimate actions until a month after issuance of the June Notice. Thus, petitioners never had a genuine opportunity to respond to the actual basis of the FDA action. As we stated in *Hess:*

> [The June, 1972,] Notice could not, fairly construed, begin to serve as an alert that manufacturers were required to analyze characteristics of a potential, as yet undisclosed, testing method, under pain of forfeiting their statutory . . . hearing. . . .
>
> \* \* \* \* \* \*
>
> . . . [U]ntil petitioners had notice of the test results, and of the FDA interpretation of those results, they cannot be said to have had [adequate] notice. (At —, at 986 of 495 F.2d)

It might be argued, nonetheless, that the FDA gave more "notice" to the premix manufacturers than to the implant manufacturers in *Hess.* Indeed, the June, 1972, Notice seems to be directed principally to the premix manufacturers. But the essence of that Notice is that the problem is residues from misuse of premixes rather than residues from normal use. Accordingly, while such notice might have given premix manufacturers a genuine opportunity to suggest curbs on misuse of premixes, it did not give them a genuine opportunity to address the actual basis of the FDA's August, 1972, action, *i. e.,* the detection of residues caused by normal use of DES feed premix. Petitioners did not have an adequate opportunity to demonstrate the existence of material issues of fact. Accordingly, the FDA's summary action withdrawing approval of petitioners' NADA's without hearing was illegal and cannot stand.

## III. INADEQUACY OF THE AUGUST, 1972, ORDER

■ In the Order of August 4, 1972, the Commissioner announced that his withdrawal of approval of petitioners' NADA's was required by the Delaney Clause (see quoted passage above at 997–998).

At oral argument, government counsel referred numerous times to DES as a known carcinogen, but he admitted, on being pressed, that the FDA could not invoke the Delaney Clause. That is also our view. The "DES" exception to the Delaney Clause, discussed above, continues effective unless the agency detects residues in a slaughtered animal while using an approved test method. And the residues detected by the Department of Agriculture were not found by an "approved method."

■ Government counsel are of course restricted to the basis for the order articulated by FDA. *See* Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 169, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) ; Rodale Press, Inc. v. FTC, 132 U.S.App.D.C. 317, 407 F.2d 1252 (1968), discussed in *Hess* (at —&ndash;— of — U.S.App.D.C., at 986–988 of 495 F.2d). They now rely on 21 U.S.C. § 360b(e)(1)(B). While that section is mentioned in the August, 1972, Order, the context satisfies us that the Commissioner was relying on the Delaney Clause. But in any event, for reasons stated in both *Hess* and this opinion, any effort at this time by the Commissioner or counsel to rely on the "new evidence" provision in Section 360b (e)(1)(B) is unavailing, because the FDA chose to act summarily, without a hearing, without making known to petitioners the nature of the "new evidence," or of the underlying tests, and without giving petitioners an opportunity to controvert the new evidence.

## IV. CONCLUSION

For the reasons stated, we vacate the Order of August 4, 1972, and remand the case to the FDA. By this action we also vacate the ancillary order of December 9, 1972.

In remanding, we add this observation. While this case is not identical with *Hess,* the cases are closely interre-

lated. We refer to basic matters identified in *Hess* as requiring a hearing—*e. g.*, the issue that the radioisotope tracer test method, which has not been "approved," may itself have produced the detected residues; the need for FDA to show some evidence that the residue, of unknown composition, is unsafe. It is our contemplation that in view of our mandate in *Hess* requiring the agency to proceed to a hearing on these issues, the FDA will follow the same course in the case at bar.

Pending the hearing petitioners may market their products, unless the FDA should withdraw approval of the NADA's prior to hearing upon a finding of an imminent hazard to public health.

So ordered.